# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEX KOKOTA, individually and on behalf of all others similarly situated, | ) ) ) |
| | ) Civil Action No.: 17-2250 |
| Plaintiff, | ) |
| | ) **CLASS ACTION** |
| v. | ) **COMPLAINT** |
| | ) |
| STATE STREET CORPORATION, STATE STREET GLOBAL MARKETS, LLC, STATE STREET GLOBAL ADVISORS, INC., CURRENEX, INC., PRINCETON FINANCIAL SYSTEMS, LLC, and STARPOINT SOLUTIONS,LLC, | ) ) **Jury Demanded** ) ) ) ) |
| | ) |
| Defendants, | ) |
| | ) |

Plaintiff Alex Kokota ("Mr. Kokota" or "Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, hereby alleges the following against State Street Corporation, State Street Global Markets, LLC, State Street Global Advisors, Inc., Currenex, Inc., Princeton Financial Systems, LLC (collectively "State Street") and Starpoint Solutions, LLC ("Starpoint," and together with State Street referred to as "Defendants"):

## INTRODUCTION

1.     This Class Action, brought by Plaintiff on behalf of himself and a class of current and former Computer Employees of Defendants, challenges Defendants' unlawful policies and practices of intentionally misclassifying such employees as independent contractors in order to avoid paying them for all hours worked and for other violations of the New York Labor Laws ("NYLL") and to seek damages in based upon Defendants' failure to comply with the requirements of the New York Wage Theft Prevention Act ("WTPA"), breach of contract and tortious interference with a contract.

2.     In an effort to unlawfully reduce labor costs, State Street has a policy and practice

of hiring its Computer Employees from staffing agencies, labeling them as "contractors," treating them as employees, paying them on an hourly basis, but refusing to pay them anything at all for any hours worked in excess of 40 each week.

3.      Defendants have a policy of refusing to approve time sheets that contain more than 40 hours and require Plaintiff and its other Computer Employees to alter their time records to reflect only 40 hours of work while all Defendants are fully aware that Plaintiff and other similarly situated Computer Employees routinely work 80 to 100 hours per week.

4.      While Plaintiff and other similarly situated Computer Employees are ostensibly employed by staffing agencies, such as Starpoint with respect to Plaintiff, State Street is their actual and/or joint employer and exerts overwhelming control over every aspect of their work.

5.      Indeed, State Street assigns, supervises, instructs and controls all of their work. State Street provides them the instruments and equipment utilized to perform all of their work. State Street sets, monitors and approves (or disapproves) their working hours.  State Street exercises authority to hire, fire, discipline, and promote them, and meets all other factors governing the employer-employee relationship for purposes of the NYLL.

## JURISDICTION AND VENUE

6.      The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 members of the class, and Plaintiff or any member of the class is a citizen of a state different than at least one Defendant.

7.      The Court also has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs and is between citizens of different states.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because this is the district in which a substantial part of the events or omissions giving rise to the claim occurred, and, with respect to Starpoint, is the district which the parties chose for resolution of their disputes via contract.  *See* Starpoint Solutions Employment Agreement, attached as Exhibit ("Ex.") A at 5.

## PARTIES TO THE ACTION

9.     Plaintiff Alex Kokota is an adult individual who, at the time of the filing of this Complaint, was a resident and domiciliary of the State of New York.  Mr. Kokota was employed by Defendants as a Computer Employee during the statutory period covered by this complaint. Defendants misclassified Mr. Kokota as an independent contractor and refused to pay him for all hours worked.

10.     Defendant State Street Corporation is, at the time of the filing of this Complaint, a domestic, for-profit corporation organized and existing under the laws of the State of Massachusetts with its headquarters located at 1 Lincoln Street, Boston, Massachusetts 02111. Defendant State Street Corporation is a financial holding company which provides financial and managerial support to several subsidiary corporations engaged in the business of investment servicing, investment management, and/or financial planning.

11.     Defendant State Street Global Markets, LLC is, at the time of the filing of this Complaint, a domestic, for-profit limited liability company organized and existing under the laws of the State of Delaware with its headquarters located at 1 Lincoln Street, Boston, Massachusetts 02111.  Defendant State Street Global Markets, LLC is a subsidiary corporation of Defendant State Street Corporation engaged in the business of investment servicing, investment management, and/or financial planning.

3

12.    Defendant State Street Global Advisors, Inc. is, at the time of the filing of this Complaint, a domestic, for-profit corporation organized and existing under the laws of the State of Delaware with its headquarters located at 1 Lincoln Street, Boston, Massachusetts 02111. Defendant State Street Global Advisors, Inc. is a subsidiary corporation of Defendant State Street Corporation engaged in the business of investment servicing, investment management, and/or financial planning.

13.    Defendant Currenex, Inc. ("Currenex") is, at the time of the filing of this Complaint, a domestic, for-profit corporation organized and existing under the laws of the State of Delaware with its headquarters located at 1700 Seaport Boulevard, Suite 240, Redwood City, California 94063.  Defendant Currenex is a subsidiary corporation of Defendant State Street Corporation engaged in the business of investment servicing, investment management, and/or financial planning.

14.    Defendant Princeton Financial Systems, LLC ("PFS") is, at the time of the filing of this Complaint, a domestic, for-profit limited liability company organized and existing under the laws of the State of New Jersey with its headquarters located at 600 College Road East, Princeton, New Jersey 08540.  Defendant PFS is a subsidiary corporation of Defendant State Street Corporation engaged in the business of investment servicing, investment management, and/or financial planning.

15.    Defendant Starpoint is, at the time of the filing of this Complaint, a domestic, for-profit limited liability company organized and existing under the laws of the State of Delaware with its headquarters located at 155 Federal Street, Suite 1102, Boston, Massachusetts 02110. Defendant Starpoint is in the business of providing consulting services to various businesses including, as in this case, Defendants State Street Corporation, and its subsidiaries State Street

4

Global Markets, LLC, State Street Global Advisors, Inc., Currenex and PFS.

16.     At all relevant times hereto, Starpoint and State Street were employers of Plaintiff within the meaning of the NYLL.

17.     At all relevant times hereto, Plaintiff was an employee of Starpoint and State Street within the meaning of the NYLL.

## FACTS

18.     State Street has a uniform policy and practice of hiring most, if not all, of its Computer Employees, including Plaintiff, through staffing agencies such as Starpoint.

19.     Such staffing agencies, including Starpoint, enter into employment contracts with Computer Employees and agree to pay them at a specific hourly rate for all time worked.

20.     State Street requires all Computer Employees to apply for employment and submit to an exhaustive background check.

21.     Upon hiring, State Street labels all Computer Employees as "contractors" and assigns them to long-term projects with the purported intention of eventually converting them to "employees."

22.     While State Street claims these contract positions to be temporary, Computer Employees typically spend their entire career at State Street working as mislabeled independent contractors.

23.     Computer Employees are told to record their working time and submit timesheets to State Street for approval.  The approved timesheets are then submitted to Starpoint each week for payment and Computer Employees are paid on a biweekly basis.

24.     However, Starpoint and State Street have a joint practice and scheme of not permitting Computer Employees to record more than 40 hours of work per week, while all

Defendants know that Plaintiff and similarly situated Computer Employees work approximately 80 to 100 hours each week.

25.    Indeed, any timesheet that shows more than 40 hours of work will not be approved by State Street.

26.    As such, Plaintiff and other similarly situated Computer Employees are not getting paid anything at all for 40 to 60 hours of work every week.

27.    Defendants' deliberate policy of refusing to preserve and maintain accurate time records is further evidence of their intentional and willful conduct.

28.    Defendants' knowledge and awareness of the Computer Employees' actual working time is undisputed, as State Street's security system requires Computer Employees to log on using their security token keys and authenticate their access using individualized usernames and passwords.  State Street thereby monitors and logs all such working time for every Computer Employee.

29.    Starpoint is likewise aware and complicit in State Street's unlawful compensation practices because Plaintiff and other similarly situated Computer Employees have often complained to Starpoint about not being paid for all time worked and were always told that "contractors" are uniformly not paid for more than 40 hours per week.

30.    For example, after one such complaint, State Street Senior Managing Director, Chad Parris, wrote to Mr. Kokota and Starpoint's Manager, Mark Sagherian: "Our intent with regard to contract positions is [not] . . . for the contractor to bill for any work outside of the budgeted rate for the position.  The hourly rate already takes into account significant difficulty and timing of the work for the position."

31.    State Street often requires Computer Employees to perform assigned work

specifically after working hours on weekdays and the weekend.

32.     For example, on March 3, 2017, State Street required certain Computer Employees to perform "Weekend Network Changes" which included upgrading firewall hardware platforms.   State Street also required certain Computer Employees to perform "Weekend Currenex Changes" which included various production patches and system updates. *See* Weekend Network Change Requests, attached as Ex. B.  Computer Employees were directed to perform this work only on the weekend.

33.     State Street routinely assigned such weekend and after-hours work to Computer Employees.

34.     Besides approving and disapproving their timesheets, State Street exercises its authority to hire, fire, discipline, promote and give raises to Plaintiff and other similarly situated Computer Employees.

35.     State Street knowingly misclassified Plaintiff and all of its Computer Employees as independent contractors while exerting overwhelming control over every aspect of their work.

36.     Indeed, State Street sets their hours, assigns, supervises and monitors their work, controls their work assignments and instructs them as to when, how, and in what manner to complete their work.

37.     Computer Employees must complete all work personally and are not permitted to hire assistants or their own employees to perform any of their work.   In fact, Computer Employees are subject to severe discipline and termination if it is discovered that another individually had accessed the system using their credentials.

38.     Computer Employees are regularly scheduled to work full-time, Monday through Friday 9 A.M. to 5 P.M., at State Street's offices located in the State of New York.  Late arrivals

or unexcused absences are grounds for discipline and termination.

39.     If fact, State Street's Manager, Jack Yoon emailed Plaintiff and other Computer Employees stating that office hours are 9 A.M. to 5 P.M. and that if anyone is running late they are required to email him.  Jack Yoon further stated: "If I don't see email and a person still doesn't show up after 10am, I will consider him out of office or absent."

40.     Plaintiff and other similarly situated Computer Employees have no discretion or input into what assignments or work they are given.  They have to perform all assigned work by State Street-imposed deadlines and in accordance with the instructions provided by State Street.

41.     Computer Employees have to regularly update State Street as to the status of their pending work and State Street closely monitors its progress, quality and adherence to deadlines and instructions.

42.     Oftentimes, State Street will direct a Computer Employee to stop working on an assignment and turn their attention to another more pressing issue.  Computer Employees are required to follow such orders and instructions or be subject to discipline.

43.     Computer Employees are required to complete State Street's periodic training sessions which instruct them as to the manner in which their work is to be completed.

44.     Plaintiff and other similarly situated Computer Employees do not exercise any managerial skill or business judgment to affect their profits or losses.

45.     In fact, Computer Employees have absolutely no opportunity or ability to increase profits and have no exposure to losses.

46.     Computer Employees can only affect the amount of money they make by working more or less hours (and even that ability is limited by the 40-hour cap).

47.     Computer Employees have no opportunity to exercise any business judgment and

are not involved in any marketing or business-generating aspects of Defendants' operations.

48.    The level of investments made by Computer Employees is virtually non-existent, especially relative to that of Defendants.

49.    State Street provides Plaintiff and all Computer Employees with all of the tools and equipment necessary to do their assigned work.

50.    Computer Employees are provided with State Street laptops, office computers, offices, office equipment, security token keys, routers, wireless internet, blackberry cellular telephones, and an email address identifying such workers as employees of the organization.

51.    Computer Employees are reimbursed for all expenses incurred in connection with any assigned work, such as train tickets, car service, taxis, gasoline, tolls, and other expenses when they travel to a remote site to test State Street's products.

52.    Computer Employees pay no money at all to begin their employment with Defendants and, likewise, face absolutely no risk of loss.

53.    Plaintiff, like all other similarly situated Computer Employees, worked 80 to 100 hours per week for Defendants; thereby making it impossible for him to provide his services to other employers.  Moreover, like other Computer Employees, the Employment Agreement that Plaintiff entered into with Starpoint effectively extinguishes his ability to work for any other employer.

54.    Not surprisingly, State Street's full-time employees are tasked with performing identical work as the Computer Employees.

55.    Computer Employees work side by side with these State Street employees.  There is no differentiation in the type of work or the manner of control that State Street exerts over these two groups of workers.  However, State Street employees are paid for all time worked,

whereas the Computer Employees are treated as free labor and required to work 40 to 60 hours per week unpaid.

**Alex Kokota**

56.     On May 4, 2015, Plaintiff entered into a "W-2 Salary Employment Agreement" with Starpoint to provide Structured Query Language ("SQL") Server Database Administrator ("DBA") services to Starpoint's client, State Street.  *See* Ex. A.

57.     The agreement specifies that "Starpoint will pay Employee Alex Kokota, at the rate of $85.00 per billable HOUR for every hour worked for the first 40 hours in a given week with an overtime rate of $90.00 per billable hour, for every hour worked over 40 hours in a given week . . ."  The Employment Agreement further states that "Payments will be made to Employee following submission of a timesheet provided by Starpoint and signed by an authorized official at the Client (State Street)."

58.     Starpoint verified Mr. Kokota's "employment status" in its September 3, 2015 "Employment Verification for Alex Kokota" letter, which states: "The purpose of this letter is to confirm the employment of Mr. Alex Kokota.  Mr. Kokota has been a permanent employee of Starpoint Solutions, LLC since May 18, 2015.  He is a senior SQL Server Database Professional working on long term projects at our client, State Street located in New York, NY."  *See* Employment Verification Letter, attached as Ex. C.

59.     As a Computer Employee, Mr. Kokota's duties included, among other things, IT support, server security maintenance, SQL server monitoring, program troubleshooting, product testing, production upgrades and database maintenance.

60.     State Street approved and disapproved Mr. Kokota's timesheets and exercised authority to hire, fire, discipline, promote and give raises to Mr. Kokota.

61.    On September 7, 2015, Defendants gave Mr. Kokota a raise to $100.00 per hour. On May 16, 2016, Defendants gave Mr. Kokota another raise to $102.00 per hour.

62.    Mr. Kokota was regularly scheduled to work full time, and was required to report to State Street's New York office Monday through Friday 9 A.M. to 5 P.M., and perform his work personally; he was not permitted to hire assistants or his own employees to do the work. Late arrivals or unexcused absences were grounds for discipline and termination.

63.    Mr. Kokota routinely worked 80 to 100 hours every week.

64.    Oftentimes, Mr. Kokota worked over 100 hours per week when State Street assigned him a high volume of weekend and after-hour work assignments.

65.    Indeed, hundreds of continuous work emails between Mr. Kokota, State Street, and Starpoint show Mr. Kokota working at all hours of the night, every day, including weekends.

66.    Moreover, Mr. Kokota was required to use security token keys and authentication codes to access State Street's systems; thereby allowing State Street to monitor Mr. Kokota's work and his actual working hours.

67.    Oftentimes, State Street required Mr. Kokota to run troubleshoots, respond to program errors, and perform various network upgrades and system tests specifically on the weekends or after regular working hours.

68.    Mr. Kokota performed all such required work, but was never paid for all time worked.

69.    It is beyond doubt that all Defendants knew that Mr. Kokota, like all other Computer Employees, routinely worked 80 to 100 hours and sometimes even over 100 hours per week.

70.    However, State Street and Starpoint devised a plan and scheme whereby they

would only pay Mr. Kokota for 40 hours of work.

71.    While Mr. Kokota's Employment Contract specified that he would be paid for all time worked, Starpoint and State Street informed Mr. Kokota that he was not permitted to record more than 40 hours of work each week.

72.    Throughout Mr. Kokota's employment at State Street, he was only permitted to enter 8 additional hours of time on two discrete occasions – on November 28, 2016 and January 18, 2017; even though he worked at least an additional 48 hours (rather than 8 hours) during those weeks.

73.    On November 28, 2016, Mr. Kokota asked his supervisor at State Street, Jack Yoon ("Yoon"), if he could record 48 hours of additional time on his timesheet since he worked straight for two days and two nights on a weekend.  On November 28, 2016, Yoon responded: "When you asked 48 hours, I thought you asked for additional 8 hours but I realize you put additional 48 hours during that weekend which I can't approve.  I have to refuse it right now. Please correct and create timesheet accordingly."

74.    Mr. Kokota responded the same day stating "I worked 2 nights and 2 days. Can I put 8 hours per day for Saturday and Sunday? 8+8."  Yoon further responded: "Our policy is not giving overtime . . . I allowed you additional hours last because I appreciate your effort but I had to fight with Chad to get his approval.  So, it would be difficult for me to get Chad's approval if you put too many hours."  Mr. Kokota responded: "I have understood, I will put 8 hours, so total 48 hours for last week."

75.    Pursuant to his employment agreement, during the week of November 28, 2016, Mr. Kokota was to be paid $102.00 for every hour worked.

76.    As detailed in his email, and supported by State Street's own secured-system

records, during the week of November 28, 2016, Mr. Kokota worked at least 88 hours.

77.    Indeed, Mr. Kokota estimates that he worked approximately 105 hours that week since he also performed considerably after-hours work that week.

78.    While Mr. Kokota should have been paid between $8,976.00 for 88 hours of work to $10,710.00 for 105 hours of work that week, Mr. Kokota was only permitted to record 48 hours of work and was only paid $4,896.00 for that week.

79.    Even though Mr. Kokota was permitted on this occasion – an occasion that only occurred twice during his entire employment – to record an additional 8 hours of work, Mr. Kokota was still not paid for all time worked and is still owed an additional $4,080.00 to $5,814.00 for 40 to 57 hours of unpaid work that week.

80.    Typically, Mr. Kokota is only paid for 40 hours each week and is consistently owed wages for, at least, approximately 40 to 60 hours of work each week.

81.    The earning statements provided by Defendants to Mr. Kokota and other similarly situated Computer Employees were not accurate because, for example, they did not accurately reflect all hours worked.

82.    Moreover, Defendants have never provided Plaintiff or any other similarly-situated Computer Employees with a notice of pay rate, as required by the WTPA.

83.    On December 1, 2016, Mr. Kokota emailed Chad Parris, who is State Street's Senior Managing Director, asking for permission to submit additional time on his timesheets since he routinely works more than 40 hours per week.  Mr. Kokota stated: "As you know I support two very large environments . . . I have high activity that I work every day after hours, weekends and holidays.  You know me as a good professional and team player and I work for your company long time."  Mr. Kokota was subsequently informed that Chad Parris had denied

his request because he, like all other Computer Employees, was only allowed to submit 40 hours of work per week.

84.    Mr. Kokota was also informed by Yoon that Mr. Parris was extremely unhappy with him for putting such communications in an email and that he should never again ask Mr. Parris such questions.

85.    Despite Mr. Parris's reproach, Mr. Kokota continually notified State Street and Starpoint that he was working well over 40 hours per week and was routinely not being paid for approximately 40 to 60 hours every week.

86.    For example, on February 13, 2017, Mr. Kokota emailed Yoon, stating: "I have put on my timesheet Feb 06 – Feb 12, 2017 8 hours for Saturday and Sunday, because I have worked 12 hours on Saturday (TruView production upgrades) and 12 hours on Sunday (All SQL Server Audit securely updates), let me know if I need to change it."  Yoon responded: "Alex, I am sorry but I can't approve that.  Please put the normal hours."  *See* email chain, attached as Ex. D.

87.    On February 24, 2017, Mr. Kokota followed up with Yoon writing: "Can you please approve my timesheets from last week asap.  I have put 40 hours (don't included [*sic.*] weekend work, there are was [*sic.*] activity on moving databases to Archive server and new QA server)."

88.    Mr. Kokota often complained to Starpoint's manager, Mark Sagherian, that State Street required him to work 80 to 100 hours every week but only allowed him to record 40 hours each week.  Mr. Sagherian often stated that he was still making a lot of money and that he should not be so greedy.  Mr. Sagherian also frequently stated that since State Street considers him a "contractor" they can pay him however they want and that State Street has a uniform policy of

only allowing its "contractors" to be paid for 40 hours of work.

89.    This concept was reiterated numerous times in emails between Mr. Kokota, State Street and Starpoint.  For example, after one such complaint, Chad Parris wrote to Mr. Kokota and Starpoint's Manager, Mark Sagherian: "Our intent with regard to contract positions is [not] . . . for the contractor to bill for any work outside of the budgeted rate for the position.  The hourly rate already takes into account significant difficulty and timing of the work for the position."

90.    On March 3, 2017, after several such complaints, Mr. Sagherian notified Mr. Kokota that State Street was ending his employment but was offering him two weeks' notice.

91.    That same day, Mr. Kokota responded by email to State Street and Starpoint stating:

> Mark Sagherian from StarPoint called me today to tell me that StateStreet was ending my employment on March 17th and that I was getting 2 weeks notice.  I will not be taking these 2 weeks.  I will be ending my employment with StateStreet today.  I am very frustrated that I constantly work more than 100 hours per week but Chad/Jack/Rajeev/Mark(from StarPoint) only approve and pay me for 40 hours per week.  They all know I work much more than 40 hours and I don't think it's fair.  I have complained many times and nothing changes.  Today is my last day.  Please approve my time sheet for this week and also send to my email ksasha2003@gmail.com, a prepaid label with tracking, I will return the company's laptop and jetpack.

*See* Email, attached as Ex. E.

92.    On March 7, 2017, Mr. Sagherian emailed Mr. Kokota stating:

> I would strongly prefer to not bring our relationship to a close in manner in which it has, but would in fact ensure that your final payroll is examined carefully, and possibly adjusted, if State Street does not confirm for me that they are in receipt of all equipment, ID badge(s) or other State Street material you need to return.

93.    The same day, Mr. Kokota responded to Mr. Sagherian providing him with his

mailing address for the return label to be shipped to so that he could return State Street's equipment and also stating: "I do not give permission for any of my wages to be withheld. Please pay me everything I am owed (for weeks February 27 – March 5, 2017) on the next scheduled pay day."

94.    As evidenced by Starpoint's "W2 CONSULTANT PAYROLL SCHEDULE" chart, attached hereto as Ex. "F," the next scheduled pay day was March 24, 2017, and work weeks ending on Sunday, March 5, 2017 are to be paid on March 24, 2017.

95.    Mr. Kokota was not paid all amounts owed on March 24, 2017.

96.    While Mr. Kokota was terminated on March 3, 2017, as of today, he has still not been paid his final paycheck for work week ending March 5, 2017.

97.    State Street exercised overwhelming control over every aspect of Mr. Kokota's work.  State Street set Mr. Kokota's hours, assigned, supervised and monitored his work, controlled his work assignments and instructed him as to when, how and in what manner to complete his work.

98.    Mr. Kokota had no discretion or input into what assignments or work he was given.  Mr. Kokota was required to perform all assigned work in accordance with the deadlines and instructions given by State Street.

99.    Mr. Kokota was also required to regularly report to State Street on the status of his work so that State Street could closely monitor his progress and ensure that the work complied with their imposed deadlines and instructions.

100.    Moreover, State Street required Mr. Kokota and its other Computer Employees to attend weekly meetings where they would submit detailed reports to State Street as to the status of their work.

101.    Mr. Kokota was required to complete State Street's periodic training sessions where he was instructed as to the manner in which he was to perform his work.

102.    Mr. Kokota had no ability to exercise any discretion or business judgment to affect his profits or losses.  Mr. Kokota could only make more money by working more hours (up to a 40 hour maximum) and had no exposure to any losses.

103.    Mr. Kokota, like other Computer Employees, was not involved in any marketing or business-generating aspects of Defendants' operations.

104.    Mr. Kokota did not have to make any investments in Defendants' business and faced no risk of losses.

105.    State Street provided Mr. Kokota with all the tools and equipment necessary for him to do his assigned work.  For example, Mr. Kokota was provided with a State Street laptop, office computers, office, office equipment, security token key, router, wireless internet and an email address identifying him as State Street's employee.

106.    Mr. Kokota was reimbursed for all expenses incurred in connection with completing his assigned work, such as train tickets, car service, taxis and other travel expenses he incurred when he travelled to a remote site to test State Street's products.

107.    Mr. Kokota's work and the manner in which State Street exerted control over Mr. Kokota and his work, was indistinguishable from that of State Street's regular employees.

108.    Indeed, Mr. Kokota worked side-by-side with State Street's regular employees, performing identical work, but unlike these "employees," he was not paid for all time worked.

## CLASS ALLEGATIONS

109.    Plaintiff brings this action as a statewide class action pursuant to the United States Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), and Rule 23 of the Federal Rules of

Civil Procedure, on behalf of himself and a class of current and former Computer Employees, to recover unpaid wages, including overtime compensation, and statutory damages pursuant to the NYLL.

110.    Plaintiff brings this action against State Street on behalf of himself and a class of similarly situated persons comprised of:

> All current and former Computer Employees who worked for State Street in the State of New York during the statutory period covered by this Complaint (the "NY Class").

111.    Plaintiff alleges on behalf of the NY Class that State Street intentionally violated the NYLL by, *inter alia*: (i) failing to pay them for all time worked; (ii) failing to pay them overtime compensation when they worked in excess of 40 hours in a workweek; (iii) failing to provide them with proper earnings statements with every payment of wages; and (iv) failing to provide them with a proper notice of pay rate as required by the WTPA.

112.    Plaintiff also brings this action against Starpoint and State Street on behalf of himself and a class of similarly situated persons comprised of:

> All members of the NY Class who were also employees of Starpoint during the statutory period covered by this Complaint (the "Starpoint Sub-Class").

113.    Plaintiff alleges on behalf of the Starpoint Sub-Class that Starpoint and State Street intentionally violated the NYLL by, *inter alia*: (i) failing to pay them for all time worked; (ii) failing to pay them overtime compensation when they worked in excess of 40 hours in a workweek (iii) failing to provide them with proper earnings statements with every payment of wages; and (iv) failing to provide them with a proper notice of pay rate as required by the WTPA.

114.    Plaintiff also alleges on behalf of the Starpoint Sub-Class that Starpoint breached

is contracts with Plaintiff and members of the Starpoint Sub-Class and that State Street tortiously interfered with these contracts and caused them to be breached by Starpoint.

115.    The NY Class and the Starpoint Sub-Class are collectively referred to as the "Classes."

116.    The claims brought pursuant to the NYLL may be pursued by all similarly situated persons who do not opt out of the Classes pursuant to Fed. R. Civ. P. 23.

117.    Members of the Classes are readily ascertainable.  The number and identity of the members are determinable from Defendants' records.  The hours assigned and worked, the positions held, and the rates of pay for each member of the Classes are also determinable from Defendants' records.  For purposes of notice, and for other purposes related to this action, the names and addresses of the members of the Classes are readily available from Defendants' records.  Notice can be provided by means permissible under Fed. R. Civ. P. 23.

118.    The members of the Classes are so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. While the exact number of the members of the Classes are unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are hundreds of individuals in each of the Classes.

119.    Common questions of law and fact, the answers to which will meaningfully advance this litigation, exist as to the Classes and predominate over any questions only affecting class members individually.  Indeed, there are few, if any, purely individual issues in this case. The questions of law and fact that are common to Plaintiff and members of the Classes include, but are not limited to:

> (a)    whether Plaintiff and members of the Classes were improperly classified

as independent contractors by State Street;

(b)    whether State Street is deemed an actual and/or joint employer of Plaintiff and members of the Classes, within the meaning of the NYLL;

(c)    whether Plaintiff and the members of Classes regularly worked without compensation, in violation of the NYLL;

(d)    whether Plaintiff and the members of the Classes worked over 40 hours per week;

(e)    whether Plaintiff and the members of the Classes were not paid for all time worked;

(f)    whether Defendants had a policy of not permitting Plaintiff and members of the Classes to record more than 40 hours of work time per week;

(g)    whether Defendants failed to pay Plaintiff and members of the Classes all overtime compensation due to them;

(h)    whether Defendants failed to furnish Plaintiff and members of the Classes with proper earnings statements with every payment of wages;

(i)    whether Defendants failed to provide Plaintiff and members of the Classes with proper notices of pay rate as required by the WTPA;

(j)    whether Starpoint breached its contracts with Plaintiff and members of the Starpoint Sub-Class;

(k)    whether Starpoint tortiously interfered with the contracts between Starpoint and members of the Starpoint Sub-Class;

(l)    whether Plaintiff and members of the Classes are entitled to compensatory damages, and if so, the means of measuring such damages;

(m)    whether Plaintiff and members of the Classes are entitled to statutory damages, and if so, the means of measuring such damages; and

(n)    whether Plaintiff and members of the Classes are entitled to liquidated damages and injunctive relief.

120.    Plaintiff's claims are typical of the claims of the members of the Classes he seeks to represent.  Plaintiff and the members of the NY Class work, or have worked, as Computer Employees for State Street.  Plaintiff and the members of the Starpoint Sub-Class work, or have worked, as Computer Employees for State Street while also being employed by Starpoint.  All members of the Classes are, or were, subject to Defendants' same compensation policies and practices, including intentionally misclassifying them as independent contractors, and refusing to pay them for all time worked and not paying them overtime compensation.  Defendants' company-wide policies and practices affected all members of the Classes similarly, and Defendants benefited from the same type of unfair and/or wrongful acts to each member of the Classes.  Plaintiff and members of the Classes sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures.

121.    Plaintiff will fairly and adequately protect the interests of the Classes because his interests are aligned with those of the members of the Classes.  Plaintiff has no interests adverse to the Classes he seeks to represent, and has retained competent and experienced counsel.

122.    Defendants have acted or have refused to act on grounds generally applicable to the Classes, thereby making final injunctive relief or corresponding declaratory relief with respect to the Classes, as a whole, appropriate.

123.    The class action mechanism is superior to other available methods for a fair and efficient adjudication of the controversy.  Common issues of law and fact predominate over any

individual issues.  The damages suffered by individual members of the Classes may be relatively small when compared to the expense and burden of litigation, making it virtually impossible for members of the Classes to individually seek redress for the wrongs done to them.

## FIRST CAUSE OF ACTION
### Violation of NYLL – Unpaid Wages
### (On Behalf of the NY Class)

124.    Plaintiff and all members of the NY Class are/were employed by State Street within the meaning of the NYLL.

125.    Plaintiff and all members of the NY Class are/were also deemed "clerical and other workers" employed by State Street within the meaning of NYLL § 190.

126.    Pursuant to NYLL § 191, Plaintiff and members of the NY Class are/were required to be paid all wages in accordance with agreed terms of employment, but not less frequently than semi-monthly, or regular paydays designated in advance by the employer.

127.    Pursuant to NYLL § 193, State Street is not permitted to make any deductions from the wages of an employee, except under certain limited circumstances described in the statute, none of which are present in this case.

128.    While Plaintiff and members of the NY Class are required to receive timely payment of all wages for all time worked, at a rate agreed upon by the terms of employment, State Street has refused to pay them for all hours worked.

129.    At all relevant times, State Street had a willful policy and practice of misclassifying Plaintiff and members of the NY Class as independent contractors in order to avoid paying them for all time worked, in violation of the NYLL.

130.    Plaintiff and members of the NY Class work, or have worked, 80 to 100 hours each week but are/were only paid for 40 hours of work.

131.    State Street's unlawful policy of refusing to pay Plaintiff and members of the NY Class for approximately 40 to 60 hours of work every week amounts to an illegal deduction from wages or is otherwise deemed unpaid wages under the NYLL.

132.    State Street's conduct is willful and intentional as evidenced by their policy and practice of rejecting timesheets that contain more than 40 hours of work.

133.    State Street is keenly aware that Plaintiff and members of the NY Class work, or have worked, considerably more hours than 40 hours each week without compensation.

134.    Indeed, this additional work is assigned, mandated and monitored by State Street.

135.    Due to State Street's violations of the NYLL, Plaintiff and the members of the NY Class are entitled to recover from State Street: compensation for unpaid wages; an additional equal amount as liquidated damages; pre- and post-judgment interest, and reasonable attorneys' fees, costs, and disbursements of this action, pursuant to NYLL § 198.

### SECOND CAUSE OF ACTION
**Violation of NYLL – Unpaid Wages**
**(On Behalf of the Starpoint Sub-Class)**

136.    Plaintiff and all members of the Starpoint Sub-Class are/were employed by Starpoint and State Street within the meaning of the NYLL.

137.    Plaintiff and all members of the Starpoint Sub-Class are/were also deemed "clerical and other workers" employed by both Starpoint and State Street within the meaning of NYLL § 190.

138.    Pursuant to NYLL § 191, Plaintiff and members of the Starpoint Sub-Class are/were required to be paid all wages in accordance with agreed terms of employment, but not less frequently than semi-monthly, or regular paydays designated in advance by the employer.

139.    Pursuant to NYLL § 193, Starpoint and State Street are not permitted to make any

deductions from the wages of an employee except under certain limited circumstances described in the statute, none of which are present in this case.

140. While Plaintiff and members of the Starpoint Sub-Class are required to receive timely payments of all wages for all time worked, at a rate agreed upon by the terms of employment, Starpoint and State Street have refused to pay them for all hours worked.

141. At all relevant times, Starpoint and State Street had a willful policy and practice of misclassifying Plaintiff and members of the Starpoint Sub-Class as independent contractors in order to avoid paying them for all time worked in violation of the NYLL.

142. Plaintiff and members of the Starpoint Sub-Class work, or have worked, 80 to 100 hours each week but are/were only paid for 40 hours of work.

143. Starpoint's and State Street's unlawful policy of refusing to pay Plaintiff and members of the Starpoint Sub-Class for approximately 40 to 60 hours of work every week amounts to an illegal deduction from wages or is otherwise deemed unpaid wages under the NYLL.

144. Starpoint's and State Street's conduct is willful and intentional as evidenced by their policy and practice of rejecting timesheets that contain more than 40 hours of work.

145. Starpoint and State Street are keenly aware that Plaintiff and members of the Starpoint Sub-Class work, or have worked, considerably more hours than 40 hours per week without compensation.

146. Due to Starpoint's and State Street's violations of the NYLL, Plaintiff and the members of the Starpoint Sub-Class are entitled to recover from Starpoint and/or State Street: compensation for unpaid wages; an additional equal amount as liquidated damages; pre- and post-judgment interest, and reasonable attorneys' fees, costs, and disbursements of this action,

pursuant to NYLL § 198.

## THIRD CAUSE OF ACTION
### Violation of NYCRR – Unpaid Overtime Wages
### (On Behalf of the NY Class)

147.    The New York State Minimum Wage Order for Miscellaneous Industries and Occupations promulgated by the New York Commissioner of Labor pursuant to the New York Minimum Wage Act (the "Wage Order") provides that all employees who are subject to exemptions of Section 13 of the Fair Labor Standards Act of 1938 ("FLSA"), must nevertheless be paid an overtime premium wage of at least one-and-one-half times the New York State minimum wage for all hours worked in excess of 40 hours per week.  12 NY CRR § 142-2.2.

148.    Plaintiff and members of the NY Class are/were "employees" of State Street within the meaning of the Wage Order.

149.    Plaintiff and members of the NY Class are entitled to at least one-and-one-half times the New York State minimum wage for all hours worked in excess of 40 hours per week, pursuant to 12 NY CRR § 142-2.2.

150.    However, NYLL § 193 prohibits an employer from making any deductions from wages; accordingly, Plaintiff and the members of the NY Class are entitled to their full hourly wage for all hours worked in excess of 40 hours per week pursuant to 12 NY CRR § 142-2.2.

151.    Plaintiff and members of the NY Class routinely work, or have worked, 80 to 100 hours every week.

152.    Plaintiff and members of the NY Class are not paid any wages at all for all hours worked in excess of 40 in a workweek.

153.    State Street's failure to pay Plaintiff and member of the NY Class in accordance with 12 NY CRR § 142-2.2, amounts to improper deductions from wages in violation of NYLL §

193.

154.    State Street's violations of 12 NY CRR § 142-2.2 and NYLL § 193 are willful and intentional as they are fully aware that Plaintiff and members of the NY Class consistently work, or have worked, in excess of 40 hours per week without compensation.

155.    Indeed, this additional work is assigned, mandated and monitored by State Street.

156.    Moreover, State Street is aware that their failure to pay Plaintiff and members of the NY Class such wages is a violation of applicable laws because Plaintiff's employment contract specifically states that Plaintiff would be paid at a premium overtime rate for all hours worked in excess of 40 hours in a workweek.

157.    Due to State Street's violations of 12 NY CRR § 142-2.2 and NYLL § 193, Plaintiff and members of the NY Class are entitled to recover from State Street: unpaid overtime wages; an additional equal amount as liquidated damages; pre- and post-judgment interest, and reasonable attorneys' fees, costs, and disbursements of this action.

### FOURTH CAUSE OF ACTION
### Violation of NYCRR – Unpaid Overtime Wages
### (On Behalf of the Starpoint Sub-Class)

158.    The Wage Order provides that all employees who are subject to exemptions of Section 13 of the FLSA, must nevertheless be paid an overtime premium wage of at least one-and-one-half times the New York State minimum wage for all hours worked in excess of 40 hours per week.  12 NY CRR § 142-2.2.

159.    Plaintiff and members of the Starpoint Sub-Class are/were "employees" of Starpoint and State Street within the meaning of the Wage Order.

160.    Plaintiff and members of the Starpoint Sub-Class are entitled to at least one-and-one-half times the New York State minimum wage for all hours worked in excess of 40 hours

per week, pursuant to 12 NY CRR § 142-2.2.

161.    However, NYLL § 193 prohibits an employer from making any deductions from wages; accordingly, Plaintiff and the members of the Starpoint Sub-Class are entitled to their full hourly wage for all hours worked in excess of 40 hours per week pursuant to 12 NY CRR § 142-2.2.

162.    Plaintiff and members of the Starpoint Sub-Class routinely work, or have worked, 80 to 100 hours every week.

163.    Plaintiff and members of the Starpoint Sub-Class are not paid any wages at all for all hours worked in excess of 40 in a workweek.

164.    State Street's failure to pay Plaintiff and members of the Starpoint Sub-Class in accordance with 12 NY CRR § 142-2.2, amounts to improper deductions from wages in violation of NYLL § 193.

165.    Starpoint's and State Street's violations of 12 NY CRR § 142-2.2 and NYLL § 193 are willful and intentional as they are fully aware that Plaintiff and members of the Starpoint Sub-Class consistently work, or have worked, in excess of 40 hours per week without compensation.

166.    Moreover, Starpoint and State Street are aware that their failure to pay Plaintiff and members of the Starpoint Sub-Class any such wages is a violation of applicable laws because Plaintiff's employment contract specifically states that Plaintiff would be paid at a premium overtime rate for all hours worked in excess of 40 hours in a workweek.

167.    Due to Starpoint's and State Street's violations of 12 NY CRR § 142-2.2 and NYLL § 193, Plaintiff and member of the Starpoint Sub-Class are entitled to recover from Starpoint and/or State Street: unpaid overtime wages; an additional equal amount as liquidated

damages; pre- and post-judgment interest, and reasonable attorneys' fees, costs and disbursements of this action, pursuant to NYLL § 198.

### FIFTH CAUSE OF ACTION
**Violation of NYLL – Failure to Provide Wage Notices
(On Behalf of the NY Class)**

168.     Pursuant to NYLL § 195(1), State Street was required to provide Plaintiff and members of the NY Class with a "Notice of Pay Rate" ("Notices") within the first ten days of their employment, and on or before February 1st of each year, listing detailed information as specified in the statute.

169.     State Street was also required to maintain signed and dated acknowledgements of the receipt of such Notices for at least six (6) years.

170.     State Street has never provided any such Notices to Plaintiff or members of the NY Class.

171.     Plaintiff and members of the NY Class have never signed or acknowledged the receipt of any such Notices because none have ever been provided to them.

172.     State Street's failure to provide such Notices was willful and intentional.

173.     As a result, State Street is liable to Plaintiff and members of the NY Class for statutory damages as set forth pursuant to NYLL § 198, along with reasonable attorneys' fees costs, and disbursements of this action.

### SIXTH CAUSE OF ACTION
**Violation of NYLL – Failure to Provide Wage Notices
On Behalf of the Starpoint Sub-Class**

174.     Pursuant to NYLL § 195(1), Starpoint and State Street were required to provide Plaintiff and members of the Starpoint Sub-Class with a "Notice of Pay Rate" within the first ten days of their employment, and on or before February 1st of each year, listing detailed

information as specified in the statute.

175.    Starpoint and State Street were also required to maintain signed and dated acknowledgements of the receipt of such Notices for at least six (6) years.

176.    Starpoint and State Street have never provided any such Notices to Plaintiff or members of the Starpoint Sub-Class.

177.    Plaintiff and members of the Starpoint Sub-Class have never signed or acknowledged the receipt of any such Notices because none have ever been provided to them.

178.    Starpoint's and State Street's failure to provide such Notices was willful and intentional.

179.    As a result, Starpoint and State Street are liable to Plaintiff and members of the Starpoint Sub-Class for statutory damages as set forth pursuant to NYLL § 198, along with reasonable attorneys' fees, costs, and disbursements of this action.

**SEVENTH CAUSE OF ACTION**
**Violation of NYLL – Failure to Furnish Accurate Earning Statements**
**(On Behalf of the NY Class)**

180.    Pursuant to NYLL § 195(3), State Street was required to furnish Plaintiff and members of the NY Class with accurate earning statements "with every payment of wages," providing accurate information as detailed in the statute.

181.    State Street has failed to provide Plaintiff and members of the NY Class with accurate earning statements because the statements do not accurately state, among other things, the number of regular hours worked and the number of overtime hours worked in the pay period.

182.    State Street's failure to furnish accurate earning statements has occurred, and continues to occur during every pay period of Plaintiff's and members of the NY Class's employment.

183.    Plaintiff and members of the NY Class work, or have worked, 80 to 100 hours each week.

184.    However, State Street furnishes Plaintiff and members of the NY Class with earning statements that inaccurately reflect only 40 hours of work.

185.    State Street's failure to furnish accurate earning statements is willful and intentional as they are fully aware that Plaintiff and members of the NY Class consistently work, or have worked, in excess of 40 hours per week.

186.    As a result, State Street is liable to Plaintiff and members of the NY Class for statutory damages as set forth pursuant to NYLL § 198, along with reasonable attorneys' fees and the costs and disbursements of this action.

### EIGHTH CAUSE OF ACTION
**Violation of NYLL – Failure to Furnish Accurate Earning Statements**
**(On Behalf of the Starpoint Sub-Class)**

187.    Pursuant to NYLL § 195(3), Starpoint and State Street were required to furnish Plaintiff and members of the Starpoint Sub-Class with accurate earning statements "with every payment of wages," providing accurate information as detailed in the statute.

188.    Starpoint and State Street has failed to provide Plaintiff and members of the Starpoint Sub-Class with accurate earning statements because the statements do not accurately state, among other things, the number of regular hours worked and the number of overtime hours worked in the pay period.

189.    Starpoint's and State Street's failure to furnish accurate earning statements has occurred, and continues to occur during every pay period of Plaintiff's and members of the Starpoint Sub-Class's employment.

190.    Plaintiff and members of the Starpoint Sub-Class work, or have worked, 80 to 100

hours each week.

191.    However, Starpoint and State Street furnish Plaintiff and members of the Starpoint Sub-Class with earning statements that inaccurately reflect only 40 hours of work.

192.    Starpoint's and State Street's failure to furnish accurate earning statements is willful and intentional as they are fully aware that Plaintiff and members of the Starpoint Sub-Class consistently work, or have worked, in excess of 40 hours per week.

193.    As a result, Starpoint and State Street are liable to Plaintiff and members of the Starpoint Sub-Class for statutory damages as set forth pursuant to NYLL § 198, along with reasonable attorneys' fees and the costs and disbursements of this action.

### NINTH CAUSE OF ACTION
**Breach of Express Contract**
**(On Behalf of the Starpoint Sub-Class Against Starpoint)**

194.    Starpoint entered into a written contract with Mr. Kokota on May 4, 2015, which was subsequently amended on September 7, 2015 and May 16, 2016, to reflect the pay raises he received from Defendants (together, "the Contract").

195.    The Contract called for Mr. Kokota to provide good and valuable consideration to Starpoint in the form of his services as a SQL Server DBA to be assigned to and to perform work for Starpoint's client State Street.

196.    The Contract called for Mr. Kokota to receive good and valuable consideration from Starpoint in the form of an hourly wage that began at $85.00 per hour for all hours up to 40 hours in a week, and $90.00 per hour for all hours after 40 in a week. *See* Ex. A at 5.

197.    On September 7, 2015, the Contract was amended to reflect Mr. Kokota's increased wage of $100.00 per hour.

198.    On May 16, 2016, the Contract was again amended to reflect Mr. Kokota's further

increased wage of $102.00 per hour.

199.    Mr. Kokota performed under the Contract by providing SQL Server DBA services to Starpoint's client, State Street, as set forth at length herein.

200.    Notwithstanding Mr. Kokota's performance under the Contract, Starpoint breached the Contract by failing to provide Mr. Kokota with the hourly wage rate set forth in the Contract for any hours Mr. Kokota worked in excess of 40 hours in a workweek, with the exception of two discrete occasions as set forth above.

201.    As a result of Starpoint's breach of the Contract, Mr. Kokota has been damaged in that he was deprived of the benefit of his bargain and the wage rate required by the Contract for all hours worked in excess of 40 hours in a workweek.

202.    Starpoint likewise entered into written contracts of employment with the members of the Starpoint Sub-Class.

203.    The written contracts between Starpoint and the members of the Starpoint Sub-Class were similar to, if not identical to, the Contract between Starpoint and Mr. Kokota.

204.    The written contracts between Starpoint and the members of the Starpoint Sub-Class also called for an hourly wage to be paid to all members of the Starpoint Sub-Class for all hours worked, including those in excess of 40 hours in a workweek.

205.    The members of the Starpoint Sub-Class each performed under the written contracts with Starpoint.

206.    Startpoint breached the contracts with the members of the Starpoint Sub-Class by failing to pay them the wage rates called for by the written contracts for any hours worked in excess of 40 hours in a workweek.

207.    As a result of Starpoint's breach of the written contracts between Starpoint and

the members of the Starpoint Sub-Class, the Starpoint Sub-Class has been damaged in that they were deprived of the benefit of their bargains and the wage rate to which each member was entitled by Contract for all hours worked in excess of 40 hours in a workweek.

208.    Accordingly, Mr. Kokota, on behalf of himself and the Starpoint Sub-Class, is entitled to recover from Starpoint the damages they have endured as a result of Starpoint's breach, along with pre- and post-judgment interest and the costs and disbursements associated with this action.

### TENTH CAUSE OF ACTION
**Tortious Interference with Contract**
**(On Behalf of the Starpoint Sub-Class Against State Street)**

209.    As set forth above, Starpoint entered into a written Contract with Mr. Kokota on May 4, 2015, which was subsequently amended on September 7, 2015 and May 16, 2016, to reflect the pay raises he received from Defendants.

210.    The Contract was valid in all respects.

211.    State Street had knowledge of the Contract through its business dealings with both Mr. Kokota and Starpoint.

212.    By State Street's intentional act of not permitting Mr. Kokota to submit time records for all hours worked in excess of 40 hours per week, State Street intentionally interfered with and caused Starpoint to breach the Contract.

213.    State Street's interference caused Mr. Kokota damage in that he lost the benefit of his bargain with Starpoint and was denied wages under the Contract for all hours worked in excess of 40 hours in a workweek.

214.    Starpoint likewise entered into written contracts of employment with the members of the Starpoint Sub-Class.

215.    The written contracts between Starpoint and the members of the Starpoint Sub-

Class were valid in all respects.

216.    State Street had knowledge of the contracts between Starpoint and the members of the Starpoint Sub-Class through its business dealings with both the members of the Startpoint Sub-Class and Starpoint.

217.    By State Street's intentional act of not permitting the members of the Starpoint Sub-Class to submit time records for all hours worked in excess of 40 hours per week, State Street intentionally interfered with and caused Starpoint to breach its contracts with the members of the Startpoint Sub-Class.

218.    State Street's interference caused the members of the Starpoint Sub-Class damage in that they lost the benefit of their bargains with Starpoint and were denied wages under the contracts for all hours worked in excess of 40 hours in a workweek.

219.    Accordingly, Mr. Kokota, on behalf of himself and the Starpoint Sub-Class, is entitled to recover from State Street the damages they have endured as a result of State Street's interference, along with pre- and post-judgment interest and the costs and disbursements associated with this action.

## ELEVENTH CAUSE OF ACTION
### Failure to Pay Final Wages
### (On Behalf of Plaintiff Against State Street and Starpoint)

220.    Pursuant to NYLL § 191(3), upon an employee's termination, by resignation or otherwise, an employer shall pay that employee's final wages not later than the regular pay day for the pay period during which the termination or resignation occurred.

221.    Defendants have failed to remit all such final wages to Plaintiff.

222.    As a result of the Defendants' unlawful and intentional failure to pay final wages to Plaintiff, Defendants have violated, and continue to violate, NYLL § 191(3).

223.    Due to the Defendants' NYLL violations, Plaintiff is entitled to recover the following from Defendant: compensation for unpaid wages; an additional equal amount as liquidated damages; pre-judgment interest; and reasonable attorneys' fees, costs, and disbursements of this action, pursuant to NYLL § 198.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and/or on behalf of all other similarly situated members of the Classes, respectfully requests that this Court grant the following relief:

A.    Designation of the action as a class action under Fed. R. Civ. P. 23 on behalf of the Classes;

B.    A declaratory judgment that the practices complained of herein are unlawful under the NYLL and/or NYCRR;

C.    An injunction against the Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with it, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

D.    An injunction against the Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with it, as provided by law, from taking any retaliatory actions against Plaintiff and members of the Classes;

E.    An award of unpaid wages to Plaintiff and members of the Classes;

F.    An award of unpaid overtime compensation to Plaintiff and members of the Classes;

G.    An award of statutory damages to Plaintiff and members of the Classes;

H.    An award of damages to Plaintiff and members of the Starpoint Sub-Class for Starpoint's breach of contracts and/or State Street's tortious interference with the Contracts;

I.    An award of liquidated damages to Plaintiff and members of the Classes;

J.      An award of pre-judgment and post-judgment interest to Plaintiff and members of the Classes;

K.      An award of costs and expenses of this action together with reasonable attorneys' and expert fees to Plaintiffs and members of the Classes; and

L.      Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by the Complaint.

Dated:  March 28, 2017                          Respectfully submitted,

                                                **FARUQI & FARUQI, LLP**


By:     */s/ Innessa S. Melamed*
        Innessa S. Melamed (IM-1916)
        685 Third Ave., 26th Floor
        New York, NY 10017
        Telephone: (212) 983-9330
        Facsimile: (212) 983-9331
        Email: imelamed@faruqilaw.com

        **TILTON BELDNER, LLP**
        Eric S. Tilton
        626 Rxr Plaza
        Uniondale, NY 11556
        Telephone: (631) 629-5291
        Facsimile: (516) 324-2170
        Email: etilton@tiltonbeldner.com

        *Attorneys for the Plaintiff*